Donna M. HANSELL, Christopher Hansell, a minor by and through his Guardian ad Litem Theodore F.L. Housel, Esquire, Shannon D'Alessandro, a minor by and through her Guardian ad Litem Theodore F.L. Housel, Esquire, Vincent D'Alessandro, a minor by and through his Guardian ad Litem Theodore F.L. Housel, Lawrence James D'Alessandro, Jr. and Carl Christopher Hansell, Plaintiffs,

v.

The CITY OF ATLANTIC CITY, Atlantic City Police Department, a subdivision of the City of Atlantic City, Nicholas V. Rifice, individually and in his official capacity, John J. Mooney, individually and in his official capacity, Kirk Sutton, individually and in his official capacity, Kirk Sutton, individually and in his official capacity, John Doe(s) A–Z fictitious name(s) i/j/s/a, Defendants.

CIV. A. No. 96–CV–5957(JAP).

United States District Court,
D. New Jersey.

June 14, 2001.

Frances A. Hartman, Moorestown, NJ, for Plaintiffs.

James P. Savio, Law Offices of James P. Savio, Margate, NJ, for Defendant Sergeant Kirk Sutton.

Joseph G. Antinori, Sherri A. Affrunti, Fox, Rothschild, O'Brien & Frankel, LLP, Lawrenceville, NJ, for Defendant Chief Nicolas V. Rifice.

Karen M. Williams, Jasinski and Paranac, P.C., Newark, NJ, for Defendant City of Atlantic City.

## OPINION

PISANO, District Judge.

### I. *Introduction*

On March 5, 1996, Lawrence James D'Alessandro, Sr. ("Mr. D'Alessandro"), an

officer for the Atlantic City Police Department ("ACPD"), while on vacation, discharged his ACPD-issued revolver at his ex-wife's residence to gain entrance and thereafter held hostage, at gun-point, plaintiffs Christopher Hansell ("Christopher"), Shannon D'Alessandro ("Shannon") and Carl Christopher Hansell ("Mr. Hansell") (the "1996 Shooting Incident"). Plaintiffs Donna M. Hansell ("Ms. Hansell"), Lawrence James D'Alessandro ("Larry"), Vincent D'Alessandro ("Vincent"), Shannon, Christopher and Mr. Hansell seek to hold certain police officers of the ACPD and the City of Atlantic City (the "City")[1] liable under a federal civil rights statute, 42 U.S.C. § 1983, and state tort law for the injuries resulting from the 1996 Shooting Incident. Although plaintiffs sustained no physical injuries as a result of Mr. D'Alessandro's private acts of violence, they claim to have suffered permanent, substantial emotional injuries.

Plaintiffs' action, initially commenced in the Superior Court of New Jersey, was removed to this Court on December 18, 1996. On May 2, 1999, plaintiffs filed an amended complaint ("First Amended Complaint")[2] against the City, Chief Nicholas V. Rifice ("Chief Rifice"), Captain John J. Mooney ("Captain Mooney"), Robert Schwartz ("Captain Schwartz") and Kirk Sutton ("Sergeant Sutton") of the ACPD. At this time, previously named defendants, Sergeant Michele A. Polk ("Sergeant Polk"), Inspector James DiNoto ("Inspector DiNoto") and Detective Robert Reilly ("Detective Reilly") were voluntarily dismissed from the suit. Subsequently, plaintiffs also voluntarily dismissed Captain Schwartz and Captain Mooney[3] from the suit.

Counts one, five and six of the First Amended Complaint assert claims under 42 U.S.C. § 1983. Plaintiffs seek to hold: (i) the individual defendants and the City liable under the state-created danger theory for failing to protect plaintiffs from Mr. D'Alessandro's acts of violence; (ii) the City liable for an alleged unconstitutional custom or practice of ignoring complaints of domestic violence made against its officers; and (iii) the City and Chief Rifice liable for their alleged failure to train and supervise the ACPD officers. Plaintiffs also assert state law causes of action against defendants for general negligence, negligent infliction of emotional distress, intentional infliction of emotional distress, and negligent training and/or failure to supervise. (*See* First Amended Complaint, counts two, three, four and seven). The remaining defendants, Sergeant Sutton, Captain Rifice and the City, have each filed a motion for summary judgment pursuant to Federal Rule of Civil Procedure ("Fed.R.Civ.P.") 56. Plaintiffs filed opposition.

This case presents a tragic set of circumstances arising from the failed marriage between Ms. Hansell and Mr. D'Alessandro, an admitted alcoholic, whose anger toward Ms. Hansell, and history of domestic violence against his family, culminated in the 1996 Shooting Incident. The facts of this case are complicated, and the Court has detailed below the

---

1. The City argues that the ACPD was improperly named as a defendant in this suit because generally police departments are not legal entities capable of being sued. The City contends that plaintiffs' suit against the ACPD should have been brought against the City. Plaintiffs have not opposed this contention.

2. Plaintiffs subsequently withdrew count eight of the First Amended Complaint, which asserts a claim for interference with employment contract. (*See* Pls.' Br. at 75).

3. With the dismissal of Captain Mooney, his Third Party Complaint against Mr. D'Alessandro was also dismissed.

lengthy history of mostly private interactions between plaintiffs and the ACPD officers. Although employed by the City as an ACPD officer, Mr. D'Alessandro was operating purely as a private actor while engaged in the 1996 Shooting Incident. While the Court does not wish to minimize the emotional trauma inflicted upon plaintiffs by Mr. D'Alessandro, it nevertheless finds that plaintiffs cannot hold Chief Rifice, Sergeant Rifice and the City accountable for the injuries resulting from Mr. D'Alessandro's private acts of violence under the specific facts of this case. For the reasons set forth below, defendants' motions for summary judgment are granted.

## II. *FACTUAL BACKGROUND*[4]

On November 17, 1973, Ms. Hansell married Mr. D'Alessandro. In 1978, Mr. D'Alessandro became employed by the City as a police officer. The couple had four children: Larry, John D'Alessandro ("John"), Vincent and Shannon. During their marriage, Mr. D'Alessandro was both physically and mentally abusive toward his wife and children. Over the years, Mr. D'Alessandro's alcohol consumption increased as did his violent propensities. (Plaintiffs' Supplemental Statement of Undisputed Facts ("Pls.' Stat."), ¶¶ 1, 2).

In October 1990, following an argument with John, Mr. D'Alessandro threatened to kill his family. When Ms. Hansell tried to intervene and hide his gun, Mr. D'Alessandro shot at her through a patio door ("1990 Shooting Incident"). Following this incident, the couple separated. (Pls.' Stat., ¶¶ 6, 7).

In January 1991, after an argument with Ms. Hansell, Mr. D'Alessandro took Larry to his apartment despite Ms. Hansell's protest. On the following day, Ms. Hansell sought custody of the couple's children and a restraining order against Mr. D'Alessandro based upon the 1990 Shooting Incident in the Superior Court of New Jersey. As a result, a temporary restraining order was issued against Mr. D'Alessandro prohibiting any contact with Ms. Hansell, and Ms. Hansell was awarded legal and primary physical custody of their children. The ACPD, however, was not informed about the issuance of the restraining order at this time. (Pls.' Stat., ¶ 7; Defs.' Stat., ¶¶ 8, 9).

During their marriage, Ms. Hansell never filed a report against Mr. D'Alessandro with the ACPD or informed his supervisors about Mr. D'Alessandro's acts of domestic violence and alcoholism. In the spring of 1991, Ms. Hansell informed her brother, Detective Reilly, about the 1990 Shooting Incident. (Defs.' Stat., ¶ 10). Ms. Hansell testified that Detective Reilly immediately called his superior, then-Captain of Intelligence, Inspector DiNoto, and informed him about the 1990 Shooting Incident. (*Id.*). Inspector DiNoto, however, denies having been informed about the 1990 Shooting Incident from Detective Reilly at this time. (DiNoto Dep. at 25:4–11). Instead, Inspector DiNoto recalls only that Detective Reilly mentioned having "some information" about Mr. D'Alessandro but, upon questioning, he told Inspector DiNoto "it was nothing" and did not provide him with any details. (DiNoto Dep. at 25:12–26:9). Although Detective Reilly instructed Ms. Hansell to go see Inspector DiNoto the following morning to report the 1990 Shooting Incident, Ms. Hansell never went to the ACPD. (Defs.' Stat., ¶ 11).

4. The Court construes the facts in a light most favorable to the plaintiffs, the parties opposing summary judgment. To the extent the Court cites to Defendants' Joint Statement of Undisputed Facts ("Defs.' Stat.") in support of factual assertions, such statements have been either admitted or not specifically disputed by plaintiffs.

Ms. Hansell testified that she informed Sergeant Polk about Mr. D'Alessandro's alcoholism and about the 1990 shooting incident while Sergeant Polk was off-duty and buying groceries. Ms. Hansell, however, specifically told Sergeant Polk that she did not want her to report the incident. Ms. Hansell testified that she did not have any expectation that Sergeant Polk would repeat their conversation and opined that she had merely confided in Sergeant Polk "as a friend." (Defs.' Stat., ¶ 13).

Ms. Hansell also testified that she occasionally discussed Mr. D'Alessandro's excessive drinking with her brother. Other than the 1990 Shooting Incident, Ms. Hansell testified that she confided in Detective Reilly in "brother/sister conversation[s]" and did not expect him to share their discussions with anyone. (Defs.' Stat., ¶ 15). Ms. Hansell also confided in close friends, ACPD officers Andrea Minor and Vince Schuman, about Mr. D'Alessandro's alcoholism and abusive behavior. (Defs.' Stat., ¶ 14; Plaintiffs' Response to Defendants' Joint Statement of Material Facts ("Pls.' Response"), ¶ 23).

After nearly twenty years of marriage, Mr. D'Alessandro and Ms. Hansell divorced on February 7, 1992. At the time of their divorce, their four children were minors. Although Ms. Hansell retained custody of the children, the final divorce degree permitted "reasonable and liberal visitation rights" for Mr. D'Alessandro. (Defs.' Stat., ¶ 17). By 1993, Larry was emancipated and Ms. Hansell released legal custody of John to Mr. D'Alessandro's mother. (Affrunti Certif., Ex. 16).

In October 1993, Ms. Hansell wed Mr. Hansell and the couple subsequently had a child, Christopher, in 1994. (Defs.' Stat., ¶ 18). Mr. D'Alessandro also remarried but the relationship between Ms. Hansell and Mr. D'Alessandro remained tense. Mr. D'Alessandro testified that his drinking increased in 1995 and 1996 due to the strained relationship between himself and Ms. Hansell. (D'Alessandro Dep. at 52:3–24). Mr. D'Alessandro testified that Ms. Hansell "would call up and scream about the kids and threaten [not to allow him] to see his kids." (D'Alessandro Dep. at 41:2–14).

On February 9, 1995, Mr. D'Alessandro called out "sick" from work because he was angry that his shift had not been changed from the 4 p.m. to 12 a.m. shift as requested. Specifically, Mr. D'Alessandro stated that the 4 p.m. to 12 a.m. shift assignment caused him "stress" insofar as working that shift placed him in violation of the New Jersey Superior Court's visitation order and prevented him from working his second job. (Defs.' Stat., ¶ 20). Ultimately, Mr. D'Alessandro's request to transfer back to the 8 a.m. to 4 p.m. shift was granted. (Defs.' Stat., ¶ 21).

Mr. D'Alessandro does not recall experiencing "any stresses from the job place" in 1995 or 1996, other than his temporary reassignment to the 4 p.m. to 12 a.m. shift. (D'Alessandro Dep. at 53:16–17; 154:13–16). Although Mr. D'Alessandro testified that he was not "as enthused" about his work, he does not recall anyone ever commenting that he seemed "stressed" or needed counseling. (D'Alessandro Dep. at 67:24–69:13). Although his co-workers were aware generally of the problems he was experiencing with Ms. Hansell, he never discussed his excessive alcohol consumption or acts of domestic violence. (Defs.' Stat., ¶ 27).

Mr. D'Alessandro was aware that the City offered an Employee Assistance Program ("EAP") in 1995 and 1996 for alcohol abuse and other problems, but he never sought assistance from the that program. Although in retrospect he believes that he had a problem with anger management

and alcoholism, he did not admit to those problems at the time. (Defs.' Stat., ¶ 29).

During Mr. D'Alessandro's employment with the City, Chief Rifice had limited interaction with him and never received any negative reports concerning his work performance. Mr. D'Alessandro never spoke with Chief Rifice about his consumption of alcohol or his relationship with Mr. Hansell. (Defs.' Stat., ¶ 30).

Ms. Hansell testified that she tried to reach Chief Rifice by telephone between February 1992 and October 1996 to speak to him about Mr. D'Alessandro's abusive behavior. Ms. Hansell, however, never spoke to Chief Rifice directly. Instead, she left messages with Chief Rifice's secretary for a return call. According to Ms. Hansell, her messages stated that Mr. D'Alessandro was her ex-husband, that she had a restraining order against him, and that she felt he was "giving her a hard time." (Defs.' Stat., ¶ 31). Ms. Hansell does not know whether Chief Rifice ever received any of her telephone messages. Chief Rifice testified that he never received any message left by Ms. Hansell regarding Mr. D'Alessandro's abusive behavior. (Defs.' Stat., ¶ 32).

During Sergeant Sutton's tenure at the ACPD, he never worked with Mr. D'Alessandro nor heard complaints about Mr. D'Alessandro's work performance. Sergeant Sutton also did not socialize with Mr. D'Alessandro. Sergeant Sutton testified that he was not aware of Mr. D'Alessandro's alcohol problems or history of domestic violence prior to 1995. (Sutton's Supplemental Statement of Uncontroverted Facts, ¶¶ 2–6).

Inspector DiNoto also testified that he was not aware of Mr. D'Alessandro having any problems with alcohol prior to the occurrence of the 1996 Shooting Incident. (Defs.' Stat., ¶ 33).

### A. *October 1995 Complaint*

On October 25, 1995, Larry and Mr. D'Alessandro were involved in an altercation in which Mr. D'Alessandro threatened to get his gun and blow Larry's head off outside Six Shooter's, a bar frequented by the ACPD officers. (Pls.' Response, ¶ 36). During their argument, an ACPD police officer on-duty, Louis A. DePaul, approached them to investigate the situation. Mr. D'Alessandro, however, instructed Officer DePaul that everything was fine and Officer DePaul proceeded on without further investigation. (Pls.' Stat., ¶ 37).

Following the argument, Larry visited the Hansell residence, which was located in Galloway Township, New Jersey, to inform Ms. Hansell about his father's threat. At the time, Larry did not reside with Ms. Hansell. Ms. Hansell immediately telephoned the ACPD and reported the incident to Captain Mooney. Ms. Hansell testified that she also informed Captain Mooney about Mr. D'Alessandro's history of violent behavior towards his family, including the 1990 Shooting Incident and the existence of a restraining order, and Mr. D'Alessandro's alcoholism. She also testified that she informed Captain Mooney that Mr. D'Alessandro was capable of carrying out his threat because Mr. D'Alessandro had a "loose trigger finger." (Defs.' Stat., ¶ 39). Ms. Hansell advised that Mr. D'Alessandro's gun should be seized. (*Id.*).

In response to her complaint, Captain Mooney advised Ms. Hansell that she should call the Galloway Township Police Department ("GTPD") in the event Mr. D'Alessandro attempted to contact her. Ms. Hansell told Captain Mooney that she expected an officer from ACPD Internal Affairs ("IA") to contact her in the morning, and declined to report the incident to the GTPD. Ms. Hansell testified that she

was not concerned with Mr. D'Alessandro contacting her that night because she mistakenly believed that there was a permanent restraining order against him at that time. (Defs.' Stat., ¶ 42).

Following his conversation with Ms. Hansell, Captain Mooney spoke with Larry, as well as Larry's friend, Bobby Mooney, who was also present at the Hansell residence. In accordance with ACPD policy and procedure, Captain Mooney performed some preliminary fact-finding concerning Ms. Hansell's complaint. In doing so, Captain Mooney obtained a statement from Officer DePaul. (Defs.' Stat., ¶ 41).

Captain Mooney prepared a report of the complaint and immediately faxed a copy of the report to IA for investigation, attaching Officer DePaul's statement. That same night, Captain Mooney sent a copy of his report to Captain Schwartz, then Captain of ACPD IA. Captain Mooney's report contained information concerning Mr. D'Alessandro's threat and stated that Ms. Hansell had a permanent restraining order against Mr. D'Alessandro. Captain Mooney's report, however, did not contain any information about Mr. D'Alessandro's history of domestic violence and alcoholism or that Ms. Hansell believed that Mr. D'Alessandro had a "loose trigger finger." Captain Mooney testified that he had no recollection of Ms. Hansell reporting such statements. (Defs.' Stat., ¶ 42).

On October 26, 1995, Captain Schwartz received Captain Mooney's report and directed Detective David Snyder to prepare a complaint brief. In relevant part, the complaint brief stated the following:

> Mrs. D'Allessandro [sic] reported, she is divorced and has a permanent restraining order against her ex-husband [Larry]. She went on to say that on 25 Oct. 95 between 0115–0130 hrs her son Larry Jr. (22 y.o.a.) and

his father were drinking and became involved in an argument. Det. L. D'Allessandro [sic] is reported to have made a threat to his son, allegedly stating, "I can get my gun and blow your fucking head off."

(Affrunti Certif., Ex. 30). Captain Schwartz then assigned the matter to Sergeant Sutton for investigation. (Defs.' Stat., ¶ 44). Under IA protocol, Captain Schwartz was required to prepare a notification form advising Inspector DiNoto of Ms. Hansell's complaint at this time. Inspector DiNoto, however, never received the notification form. (DiNoto Dep. at 19:3–22).

When Sergeant Sutton received the complaint brief on October 25, 1995, he skimmed it and determined it was not an emergency matter. Sergeant Sutton testified that, based upon experiences related to his own divorce, he did not believe it was an emergency because it involved an ex-wife complaining about her ex-husband making a parental correction "of his son." (Pls.' Stat., ¶¶ 49, 50).

On October 27, 1995, in accordance with ACPD policy, the complaint brief was faxed to the Atlantic County Prosecutor's Office, along with a copy of Captain Mooney's report and Officer DePaul's statement. The Prosecutor's Office did not take any action in response to the receipt of the complaint brief, nor did it request that the ACPD undertake any action. (Defs.' Stat., ¶ 46). Sergeant Sutton testified that he did not investigate the complaint during the months of October and November 1995 and does not recollect Captain Schwartz ever discussing the complaint with him. (Defs.' Stat., ¶ 47).

According to Sergeant Sutton, Ms. Hansell's complaint was ultimately "lost in the shuffle." (Defs.' Stat., ¶ 47). The only thing Sergeant Sutton did to investigate it

during 1995 and early 1996 was to have a brief conversation with Mr. D'Alessandro about the complaint. During their conversation, Mr. D'Alessandro told Sergeant Sutton that he had simply had an argument with his son and his ex-wife had overreacted. Sergeant Sutton requested that Mr. D'Alessandro "not do anything else because he didn't need any more complaints." (Pls.' Stat., ¶ 55; Defs.' Stat., ¶¶ 47, 48).

**B. 1996 Shooting Incident**

Despite his right to reasonable and liberal visitation, Mr. D'Alessandro believed that Ms. Hansell was preventing him from seeing Shannon and Vincent in February 1996.[5] (Defs.' Stat., ¶¶ 17, 19). Frustrated by his inability to see his children, Mr. D'Alessandro went on vacation and began to drink heavily. On March 5, 1996, Mr. D'Alessandro, while on vacation and in a highly intoxicated state, went to the Hansell residence to scare Ms. Hansell. (Defs.' Stat., ¶ 49). While wearing his ACPD-issued bullet proof vest, Mr. D'Alessandro discharged his ACPD-issued revolver at the front door to gain entry. He shot at and narrowly missed Mr. Hansell. Eventually, he successfully entered the house and held hostage Mr. Hansell, Shannon and Christopher, which prompted Shannon to plead for their lives. (Pls.' Response, ¶ 15). Larry did not reside at the Hansell residence, and Ms. Hansell and Vincent were not at home at the time. The GTPD police officers were dispatched to the house and eventually convinced D'Alessandro to voluntarily surrender. (Id.). At the time of the 1996 Shooting Incident, Larry, Vincent, Shannon and Christopher were approximately twenty-two, fourteen, eight, and two years of age,

respectively. None of the hostages were physically injured.

Following Mr. D'Alessandro's arrest, Captain Schwartz paged Sergeant Sutton and thereafter directed Sergeant Sutton to meet him at the GTPD. Once Sergeant Sutton arrived at the GTPD, he recalled the earlier investigation that he had not completed. Sergeant Sutton immediately advised Captain Schwartz that the pending complaint was sitting on his desk and had not been investigated. (Defs.' Stat., ¶ 51). Sergeant Sutton apologized to Ms. Hansell stating that "I dropped the ball, I am really sorry." (Pls.' Response, ¶ 15). Sergeant Sutton acknowledged that he failed to fully investigate her complaint. (Id.).

Subsequent to Mr. D'Alessandro's arrest, police officers secured five other non-ACPD issued weapons from Mr. D'Alessandro's home. (Defs.' Stat., ¶ 52). Mr. D'Alessandro did not inform anyone at the ACPD of his intention to carry out his acts of violence. (D'Alessandro Dep., at 150:17–20). Mr. D'Alessandro's employment was terminated effective March 6, 1996. (Defs.' Stat., ¶ 58). On March 14, 1996, New Jersey Superior Court Judge entered a Final Restraining Order against Mr. D'Alessandro, prohibiting his contact with Mr. Hansell, Ms. Hansell, Vincent, Shannon and Christopher. (Defs.' Stat., ¶ 54). On June 10, 1996, Mr. D'Alessandro pled guilty to aggravated assault. (Defs.' Stat., ¶ 56).

**C. The Relevant Policies and Procedures of the ACPD**

ACPD General Order Nos. 2, 3, and 9 on domestic violence supplement the State Domestic Violence Procedures Manual and

---

**5.** According to Ms. Hansell, it was Vincent's and Shannon's decision not to see their father after a visit in February 1996, during which Mr. D'Alessandro punched Vincent and "swung" Shannon by the hair. Ms. Hansell did not report this incident to the ACPD. (Defs.' Stat., ¶ 24).

establish a uniform policy for officers handling, investigating and responding to domestic violence situations. (Defs.' Stat., ¶ 62). ACPD General Order No. 2 defines "domestic violence" to include terroristic threats made against "an emancipated minor" who has been subject to domestic violence by a former household member. (Affrunti Certif., Ex. 47).

ACPD General Order No. 9 sets forth the City's policy regarding the seizure of weapons from officers involved in domestic violence incidents. Section II of ACPD General Order No. 9, entitled "Guidelines for the Seizure of Weapons from a Law Enforcement Officer involved in a Domestic Violence Incident," provides that all weapons, department issued and personal, shall immediately be seized or surrendered:

> Whenever a law enforcement officer is charged with committing an act of domestic violence as defined in N.J.S.A. 2C:25–19 (and a criminal complaint or a temporary restraining order is issued or the officer is charged with being in contempt of the restraining order or weapons are ordered to be seized as a condition of bail or pursuant to a domestic violence warrant for the search and seizure of weapons).

(Affrunti Certif., Ex. 48). Because N.J.S.A. 2C:25–19 requires "that there be ... objective factors that would support a reasonable belief ... that the presence of a weapon would expose the victim to a risk of serious bodily injury," the Attorney General of New Jersey clarified its guidelines for seizure of weapons by a letter, dated June 13, 1996 ("June 1996 Clarification Letter"), stating that "the statutory provision does not contemplate a routine seizure of weapons in all cases." (Affrunti Certif., Ex. 49). Instead, the investigating officer is advised to consider the nature of the charges and the history of violence between the parties in determining whether a reasonable belief exists to seize the weapon. (*Id.*).

ACPD General Order No. 4 ("IA Order"), entitled "Internal Affairs Section and Complaint Review," requires that allegations of misconduct against members of the police department be thoroughly and expeditiously investigated. Barring exceptional circumstances, all complaints of a "major nature" reported to the ACPD must be investigated within 45 days of their receipt. If any reason exists which prevents the completion of an investigation within the requisite 45 days, a letter to the complainant explaining the status of the investigation and the anticipated completion date from the IA captain must be sent. (Defs.' Stat., ¶ 64).

Under the IA Order, the IA captain is to receive and review all incoming complaints, assign and oversee all internal investigations, and in situations involving allegations of criminal misconduct, report the matter to the reviewing inspector and the police chief in order for a decision to be made whether to pursue a criminal investigation. (Defs.' Stat., ¶ 65). Sergeants assigned to investigate IA complaints are required to conduct complete, objective and professional investigations, as well as to keep the IA captain apprised of all developments during the investigation. (Defs.' Stat., ¶ 66).

The IA Order provides that all allegations of domestic violence by an officer reported from an officer's family member will be handled by IA. (Defs.' Stat., ¶ 67). The IA Order further provides that complaints against police officers received after normal working hours must be taken by a superior officer on duty. The superior officer (captain or sergeant) taking the complaint must make an assessment, based upon the circumstances, as to whether to bring in immediately an on-call

IA investigator or to forward the complaint to IA for investigation the following morning. Once the complaint is forwarded to IA, IA is then required to follow up on the complaint immediately and to conduct a thorough investigation into all allegations. (Defs.' Stat., ¶ 68; Pls.' Stat., ¶ 24).

The ACPD rules prohibit the consumption of alcoholic beverages while on duty and direct that all ACPD officers "shall be temperate" in the use of liquor while off-duty. (Defs.' Stat., ¶ 70). The City provides an EAP to assist employees and their immediate family members with personal problems, including drug and alcohol abuse. Referral to the program occurs either (1) by a supervisor based on documented, work-related deficiencies or (2) through an employee's own initiative. Employees seeking to take advantage of the program are advised to contact a designated supervisor who can arrange appropriate counseling based upon the employee's needs. (Defs.' Stat., ¶ 71). ACPD personnel are informed of the EAP at the time of hiring, during police academy training, and by annual letters from the City. Information about the EAP is also included in the City's personnel manual. (Defs.' Stat., ¶ 72).

The chain of command for the ACPD is from patrolman to supervisor/sergeant to commander/captain to division inspector to chief of police. (Defs.' Stat., ¶ 73). In 1990, formal evaluations within the ACPD were halted because it was perceived that supervisors were not completing accurate evaluations of subordinates. Since then, inspectors are required to oversee specific divisions and monitor and evaluate the work performances of their subordinates. (Defs.' Stat., ¶ 74).

## D. *IA Department*

In 1990, IA reported directly to the chief of police. In or about 1992, the hierarchy was changed and an inspector was appointed to oversee IA. (Defs.' Stat., ¶ 75). On April 18, 1993, Captain Schwartz was assigned to IA as a sergeant. Thereafter, on March 25, 1994, Captain Schwartz was promoted to IA captain. (Defs.' Stat., ¶ 76). In or about 1994, Inspector DiNoto was assigned to oversee IA and remained in that position until 1997. At the time of his appointment, Inspector DiNoto had experience and training in management and supervision. (Defs.' Stat., ¶ 77).

Sergeant Sutton began his employment with the ACPD in 1980. He received a total of fourteen weeks training at the Atlantic City Police Academy. He was promoted and assigned to IA in 1994. Sergeant Sutton did not receive any additional training before being assigned to IA. There was no specific IA training that he received during his tenure in the IA department. (Pls.' Stat., ¶¶ 27–29, 32).

On March 29, 1994, Captain Schwartz met with Chief Rifice and presented to him a memorandum detailing additional personnel, equipment and training Captain Schwartz believed IA needed. On April 6, 1994, Captain Schwartz also sent a Memorandum to Inspector Kane requesting the assignment of a detective to IA. (Defs.' Stat., ¶ 78).

In response to Captain Schwartz's memorandum, the ACPD accommodated many of his requests. The ACPD assigned a new detective to IA; provided computers, typewriters, bottled water, and additional vehicles; and upgraded telephones and computers. The ACPD also amended the department's IA Order in November 1995, so that minor rule infractions could be investigated by superior officers, rather than IA. This change in IA management resulted in a 42.85% reduction in IA caseloads. (Defs.' Stat., ¶ 79).

In 1995 and through March 1996, IA procedures required that Captain Schwartz notify Inspector DiNoto, by way of notification sheet, which included the name of the complainant, the name of the suspect, the case number, and a brief summary of the rules alleged to be violated. Captain Schwartz was then required to oversee the investigation of the complaint by an assigned sergeant. At the conclusion of an investigation, Inspector DiNoto received the complaint brief and would then forward the complaint brief to Chief Rifice. (Defs.' Stat., ¶ 80).

Upon receipt of a complaint, it was Captain Schwartz's duty to categorize the complaint and assign it for investigation. Generally, Captain Schwartz assigned cases on a rotation basis to sergeants within IA. However, if he had a specific sergeant in mind to handle a particular complaint, he would assign that sergeant to investigate the matter. (Defs.' Stat., ¶ 81).

Other than complaints of a "major nature," which were required to be investigated within 45 days of their receipt, there were no specific guidelines as to how long an investigation should take. (Pls.' Stat., ¶ 103). There was no system in place between October 1995 and March 1996 to track which cases were being investigated by IA officers. (Pls.' Stat., ¶ 106). The determination of which cases a sergeant should work on most intensely was left up to the sergeant. (Pls.' Stat., ¶ 107).

Between October 25, 1995 and March 5, 1996, the IA was overwhelmed with cases. (Pls.' Stat., ¶ 98). During this time, IA lost one senior sergeant due to medical leave and the replacement sergeant had to be brought up to speed. (Pls.' Stat., ¶ 97). Between October 1995 and March 1996, each IA sergeant had assigned to him between thirty to forty cases. (Pls.' Stat., ¶ 104).

While working in IA, Sergeant Sutton expressed concern to Captain Schwartz that he felt his caseload was unmanageable. Sergeant Sutton told Captain Schwartz that he believed he should be removed from the assignment rotation since he often received specific cases. Particularly, Sergeant Sutton testified that by July 1995, his cases had escalated from approximately ten to fifty open cases. Despite Sergeant Sutton's request, Captain Schwartz did not remove Sergeant Sutton from the assignment rotation. (Defs.' Stat., ¶ 83).

### E. *Emotional Injuries to Plaintiffs*

Plaintiffs' psychiatric expert, Dr. Susan Feister, M.D. ("Dr. Feister"), diagnosed Ms. Hansell as suffering from posttraumatic, depressive and anxiety symptoms as a result of the 1996 Shooting Incident. In a report submitted in support of Ms. Hansell's claims, Dr. Feister opined that Ms. Hansell will require two to three years of individual psychotherapy to address the 1996 Shooting Incident's impact on her life. (Defs.' Stat., ¶ 97).

Upon examination, Dr. Feister also opined that Mr. Hansell developed symptoms of depressive and post-traumatic stress disorders as a result of the 1996 Shooting Incident. In a report submitted in support of Mr. Hansell's claims, Dr. Feister opined that Mr. Hansell will need psychotherapeutic and pharmacotherapeutic treatment for the next year or two. (Defs.' Stat., ¶ 98).

Although Larry was not present at the time that the 1996 Shooting Incident occurred, Dr. Feister concluded that the incident has caused him to suffer from depression and post-traumatic stress disorder. In a report in support of Larry's claims, Dr. Feister opined that Larry will require "individual psychotherapy for the next one to two years to address the pervasive neg-

ative consequences of the hostage incident in his relationships and his life in general." (Defs.' Stat., ¶ 99). Dr. Feister also noted that Larry will need "medication for at least one or two years depending on his response." (*Id.*).

Dr. Feister also examined Vincent and diagnosed him with major depressive disorder and post-traumatic stress disorder as a result of the 1996 Shooting Incident. According to Dr. Feister, it is likely that Vincent's psychiatric disorders will "clear" with one or two years of psychotherapeutic and pharmacotherapeutic intervention. (Defs.' Stat., ¶ 100).

Dr. Feister determined that Shannon suffered symptoms of depressive and post-traumatic stress disorders "which were present for several years after the [1996 Shooting] incident." (Defs.' Stat., ¶ 101). In her report, Dr. Feister predicted Shannon's condition will "likely" improve with two to three years of aggressive psychological and psychiatric treatment. (*Id.*).

### III. *Summary Judgment Standard*

To prevail on a motion for summary judgment, the moving party must establish "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The district court's task is to determine whether disputed issues of material fact exist, but the court cannot resolve factual disputes in a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is material if it might affect the outcome of the suit under the governing substantive law. *Id.* In determining whether a genuine issue of material fact exists, the court must view the facts in the light most favorable to the non-moving party and extend all reasonable inferences to that party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct.

1348, 89 L.Ed.2d 538 (1986); *Stephens v. Kerrigan,* 122 F.3d 171, 176–177 (3d Cir. 1997). "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505.

The moving party always bears the initial burden of demonstrating the absence of a genuine issue of material fact, regardless of which party ultimately would have the burden of persuasion at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has met its opening burden, the non-moving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial. *Id.* at 324, 106 S.Ct. 2548. Thus, the non-moving party may not rest upon the mere allegations or denials of its pleadings. *Id.* "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322, 106 S.Ct. 2548.

Once the moving-party has demonstrated to the court the absence of a material fact at issue, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586–87, 106 S.Ct. 1348 (citations omitted). In other words, "[i]f the evidence [submitted by the non-moving party] is merely colorable ... or is not significantly probative ... summary judgment may be granted." *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505 (citations omitted).

The Supreme Court has specifically recognized that:

"One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupportable claims or defenses, and ... that [the rule] should be interpreted in a way that allows it to accomplish this purpose."

*Celotex*, 477 U.S. at 323–24, 106 S.Ct. 2548. Thus, "[w]hen the record is such that it would not support a rational finding that an essential element of the non-moving party's claim or defense exists, summary judgment *must* be entered for the moving party." *Turner v. Schering–Plough Corp.*, 901 F.2d 335, 341 (3d Cir.1990) (emphasis in original); *Aronow Roofing Co. v. Gilbane Bldg. Co.*, 902 F.2d 1127, 1128 (3d Cir.1990) (same).

## IV. *Discussion*

In the First Amended Complaint, plaintiffs assert federal civil rights claims under 42 U.S.C. § 1983 and state tort law claims. Plaintiffs have advanced numerous theories of liability under § 1983. Plaintiffs seek to hold (i) Captain Sutton, Chief Rifice and the City liable for the private acts[6] of Mr. D'Alessandro based upon the state-created danger theory; (ii) the City liable for allegedly having an unconstitutional custom or practice of ignoring complaints of domestic violence; and (iii) the City and Chief Rifice liable for allegedly having failed to supervise and train the ACPD officers. Plaintiffs also assert state causes of action against defendants for general negligence, negligent infliction of emotional distress, intentional infliction of emotional distress, and negligent training and/or failure to supervise. The Court addresses plaintiffs' § 1983 claims and state tort law claims separately below.

### A. *Section 1983 Claims*

 The Court begins its analysis by reviewing the requirements for establishing a constitutional claim under 42 U.S.C. § 1983. The pertinent language of 42 U.S.C. § 1983 states:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, or any State or Territory, ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

"Section 1983 does not, by its own terms, create substantive rights; it provides only remedies for deprivations of rights established elsewhere in the Constitution or federal laws." *Kneipp v. Tedder*, 95 F.3d 1199, 1204 (3d Cir.1996) (citation omitted). Notably, § 1983 does not create a cause of action based upon violations of state statutes. *See Brown v. Grabowski*, 922 F.2d 1097, 1113 (3d Cir.), *cert. denied*, 501 U.S.

---

**6.** Although alleged in the First Amended Complaint, plaintiffs do not assert in their opposition brief that Mr. D'Alessandro was a state actor while engaged in the 1996 Shooting Incident. Nor could plaintiffs maintain this position based upon the undisputed facts of this case. Mr. D'Alessandro, the "underlying active tortfeasor, acted in a purely private capacity when he committed" the aggravated assault. *See Mark v. Borough of Hatboro*, 51 F.3d 1137, 1150–52 (3d Cir.), *cert. denied*, 516 U.S. 858, 116 S.Ct. 165, 133 L.Ed.2d 107 (1995)("[A]cts of officers in the ambit of personal pursuits are plainly excluded.") (citation omitted). Although Mr. D'Alessandro was wearing an ACPD-issued bullet proof vest and carrying an ACPD-issued revolver, his acts of violence on March 5, 1996 were not in any way related to the performance of police duties. The Third Circuit has emphasized that "if a person's actions 'were not committed in the performance of any actual or pretended duty,' the actions were not committed under color of law." *Id.* at 1151 (citation omitted).

1218, 111 S.Ct. 2827, 115 L.Ed.2d 997 (1991). Thus, "[t]o establish a claim under 42 U.S.C. § 1983, [a plaintiff] must demonstrate a violation of a right secured by the Constitution and the laws of the United States [and] that the alleged deprivation was committed by a person acting under color of state law." *Moore v. Tartler*, 986 F.2d 682, 685 (3d Cir.1993). Here, plaintiffs contend that the City and its police officers violated their liberty interest in personal security under the due process clause of the Fourteenth Amendment by failing to protect them from Mr. D'Alessandro's violence on March 5, 1996.

1. *Duty to Protect Under the Due Process Clause*

█ Although as a general rule, "the state has no affirmative obligation to protect its citizens from the violent acts of private individuals," the "state-created danger" theory of liability is an exception to this rule. *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 907 (3d Cir.1997).

The genesis of the state-created danger theory is found in the Supreme Court's decision in *DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989). In *DeShaney*, a caseworker received several complaints and personally observed a number of suspicious injuries to Joshua DeShaney, but took no action to protect the child. The child's father eventually beat the boy so severely that he suffered permanent brain damage. The child and his mother sued the department of social services under 42 U.S.C. § 1983 for depriving Joshua of his liberty interest in " 'free[dom] from ... unjustified intrusion on personal security' " under the due process clause of the

Fourteenth Amendment "by failing to provide adequate protection against the father's violence." *Id.* at 195, 109 S.Ct. 998 (*citing Ingraham v. Wright*, 430 U.S. 651, 673, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977)). Although the *DeShaney* Court held that the state had no affirmative duty to protect the child,[7] it explicitly acknowledged that "[w]hile the State ⋅may have been aware of the dangers that Joshua faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them." *Id.* at 201, 109 S.Ct. 998.

█ As the courts have interpreted this language, a state-created danger exists "[w]hen state actors knowingly place a person in danger, the due process clause of the constitution ... render[s] them accountable for the foreseeable injuries that result from their conduct." *Mark v. Borough of Hatboro*, 51 F.3d at 1151 (citation omitted). Thus, liability under the due process clause may be imposed "where the harm—though at the hands of a private actor—is the product of state action that legitimately can be characterized as affirmative conduct." *Id.* at 1151.

Prior to its decision in *Kneipp v. Tedder*, the Third Circuit repeatedly declined to recognize the state-created danger theory applicable because the state actor's failure to protect individuals from harm could not be characterized as "affirmative" conduct. In *Brown*, the police received a report from plaintiff's decedent, Deborah Evans, that her former boyfriend had held her hostage for three days, during which he threatened and sexually assaulted her. *See Brown*, 922 F.2d at 1102. The police

---

7. The Supreme Court in *DeShaney* "held that in the absence of an affirmative exercise of state power that 'so restrains an individuals's liberty that it renders him unable to care for himself,' a state has no positive duty to ensure that the individual's life, liberty, or property 'do not come to harm through other [than state] means.' " *Brown*, 922 F.2d at 1113–14 (citations omitted).

did not arrest her former boyfriend, and failed to inform her about her right to request a temporary restraining order under New Jersey's Prevention of Domestic Violence Act. Shortly following her visit to the police, Evans was abducted by her former boyfriend and ultimately placed unconscious in the trunk of her car to freeze to death. The Third Circuit did not find the state-created danger applicable, finding that plaintiff failed to offer any evidence that the police officers "acted to create or to exacerbate the danger" the former boyfriend presented to the victim.[8] *Id.* at 1116.

In *D.R. by L.R. v. Middle Bucks Area Vo. Tech. Sch.,* 972 F.2d 1364 (1992), the Third Circuit also found the state-created danger theory inapplicable. The plaintiffs in *D.R.* alleged that while attending art classes during the school year, several male students from the class sexually molested them in the unisex bathroom, which was part of the classroom. *See D.R.,* 972 F.2d at 1366. The female student plaintiffs alleged that the assistant director of the school was informed that a male student was trying to force one of the plaintiffs into the bathroom for the purpose of engaging in sexual conduct, and that many other individual defendants had knowledge of the severe non-sexual misconduct occurring in the classroom. *Id.*

Despite acknowledging "the apparent indefensible passivity" of some of the school officials, the Third Circuit found that the school's assistant director's failure to investigate allegations of misconduct did not rise to a level of a constitutional violation. *Id.* at 1376. The Third Circuit equated the conduct of the school officials to the defendants in *DeShaney,* noting that "[t]he most that can be said of the state functionaries

in this case is that they stood by and did nothing when suspicious circumstances dictated a more active role for them." *Id.* (citation omitted). In affirming the dismissal of plaintiffs' complaint, the Third Circuit stated that plaintiffs failed to "demonstrate that defendants violated a constitutional duty by creating or exacerbating the danger posed by" the male students. *Id.*

In *Kneipp,* the Third Circuit recognized for the first time the applicability of the state-created danger theory. The Third Circuit held that the plaintiff had raised a triable issue of fact as to whether defendants had violated Samantha Kneipp's Fourteenth Amendment right to substantive due process when the police officers left her by the roadside on a cold winter night to find her way home alone, despite her severely intoxicated state and after having earlier allowed her husband to leave the scene. *Id.* at 1201, 1211. The Third Circuit concluded that a reasonable jury could find that Samantha "was in a worse position after the police intervened than she would have been had they not done so," and that "[a]s a result of the affirmative acts of the police officers, the danger or risk of injury to Samantha was greatly increased." *Id.* at 1109.

■ In *Kneipp,* the Third Circuit adopted the following four-part test to determine whether the state-created danger theory applies in any given case:

(1) the harm ultimately caused was foreseeable and fairly direct; (2) the state actor acted in willful disregard for the safety of plaintiff; (3) there existed some relationship between the state and the plaintiff; and (4) the state actors used their authority to create an oppor-

---

**8.** The *Brown* court noted that although the police officers "should have instructed [Evans] as to her rights under the [Domestic

Violence] Act," the officers were not "constitutionally compelled to do so." *Brown,* 922 F.2d at 1116.

tunity that otherwise would not have existed for the third party's crime to occur.

*Kneipp,* 95 F.3d at 1208 (quoting *Mark,* 51 F.3d at 1152). The critical inquiry for applying the "state-created danger" theory has been "whether the state actors involved affirmatively acted to create plaintiff's danger, or to render him or her more vulnerable to it." *D.R.,* 972 F.2d at 1373–74; *Mark,* 51 F.3d at 1152 ("[T]he environment created by the state actor must be dangerous; they must know it to be dangerous; and . . . they must have used their authority to create an opportunity that would not otherwise have existed for the third party's crime to occur") (citation omitted). As discussed below, plaintiffs here have failed to present sufficient evidence to raise a triable issue of fact that the ACPD officers increased plaintiffs' vulnerability to harm under the fourth prong of the *Kneipp* test.[9]

To survive summary judgment, plaintiffs must produce evidence from which a jury could conclude that the officers "used their authority to create an opportunity that otherwise would not have existed" for Mr. D'Alessandro to injure plaintiffs. *Kneipp,* 95 F.3d at 1208. The Third Circuit has acknowledged that "the question of whether an affirmative act is required under the state-created danger theory, and if so what constitutes an affirmative act for purposes of liability, is less than clear." *Morse,* 132 F.3d at 914. The Third Circuit, however, concluded that "the dispositive factor appears to be whether the state has in some

way *placed* the plaintiff in a dangerous position that was foreseeable, and not whether the act was more appropriately characterized as an affirmative act or an omission." *Id.* at 915 (emphasis added).

The relevant inquiry, therefore, is whether the ACPD officers' acts or omissions "placed" the direct victims of Mr. D'Alessandro's violence, Mr. Hansell, Shannon and Christopher, in greater danger than they had already faced such that the state can be said to have "created" a danger to plaintiffs. *See Wood v. Ostrander,* 879 F.2d 583, 590 (9th Cir.1989) (where police officers arrested a drunk driver and impounded his car, thereby leaving the female passenger stranded on the road in a notoriously high crime area, plaintiff raised a triable issue of fact as to whether the state affirmatively placed plaintiff in a position of danger); *Cornelius v. Town of Highland Lake,* 880 F.2d 348, 358 (11th Cir.1989)(concluding that a triable issue of fact existed where defendants affirmatively created a dangerous situation by establishing a prisoner work squad and assigning violent inmates to work around town hall).

Plaintiffs contend that defendants, by failing to investigate the complaints of domestic violence made by Ms. Hansell against Mr. D'Alessandro, "enhanced [Mr. D'Alessandro's] feeling of invulnerability and allowed him to use his position as a police officer as a shield," thereby increasing the risk of harm to plaintiffs. (Pls.' Br. at 47). Plaintiffs rely on two district court decisions from the Northern District

---

9. In the alternative, with respect to the individual defendants, Chief Rifice and Sergeant Sutton, the Court further finds that plaintiffs have failed to raise a triable issue of fact under the second prong of the *Kneipp* test. The second prong requires plaintiffs to demonstrate that the state actors acted with willful disregard or deliberate indifference to plaintiffs' safety. *See Morse,* 132 F.3d at 910.

Here, plaintiffs have not presented any evidence that Chief Rifice even received the messages left by Ms. Hansell, and the most Sergeant Sutton's conduct can be characterized as is negligent. *See County of Sacramento v. Lewis,* 523 U.S. 833, 849, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998) ("liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process").

of Illinois, one unpublished, *Wright v. Village of Phoenix*, No. 97 C 8796, 2000 WL 246266 (N.D.Ill. Feb.25, 2000), and the other published, *Sadrud-Din v. City of Chicago*, 883 F.Supp. 270 (N.D.Ill.1995), in support of their position. Defendants contend that these cases are distinguishable.

In *Wright*, plaintiff alleged that police officers repeatedly failed to protect Stephanie Jackson Berry from the violence of her husband, Ronnie Berry, the former chief of police. *See Wright*, 2000 WL 246266 at \*1. In 1994, Jackson–Berry's brother went to the police department to file a complaint on her behalf and the officers refused to make a report. In 1995, officers responded to a call that Berry was beating his wife, but left without assisting her when Berry told them to "mind your own business." *Id.* at \*2. While Berry was chief of police, officers responded to a call for help "but departed when Berry told them to leave or be fired." *Id.* In 1996, numerous police officers responded to calls of domestic violence but did not arrest Berry or intercede on behalf of Jackson–Berry. In December 1996, "Berry hit her in the head with a handgun, dragged her to the basement, bound her with duct tape, covered her with a tarp, and shot her in the chest." *Id.*

The court in *Wright* acknowledged that to the extent plaintiff's due process claims are premised on an assertion that the police failed to protect Jackson–Berry from domestic violence in general, such claims must fail under *DeShaney*. *Id.* at 200–02, 109 S.Ct. 998. The court, however, construed plaintiff's allegation "that Berry successfully staved off his fellow officers by . . . telling them 'they better leave or he would fire them,'" to assert a state-created danger theory of liability. *Id.* The court explained that the police officers "took affirmative steps to enhance the danger by coming to the house and then leaving when Berry told them to do so, potentially lulling Berry into an enhanced sense of invulnerability." *Id.*

The facts of the present case, however, do not demonstrate that Mr. D'Alessandro was allowed to use his position as a police officer to shield himself from investigation. Unlike the facts of *Wright*, plaintiffs do not even allege that they were prevented from filing a report against Mr. D'Alessandro by the ACPD officers. Although Ms. Hansell testified that she confided in ACPD officers Polk, Minor and Schuman about Mr. D'Alessandro's alcoholism and domestic violence, she never instructed them to report her complaints. Furthermore, when Detective Reilly directed her to report the 1990 Shooting Incident to Inspector DiNoto in the Spring of 1991, she failed to do so. Although Ms. Hansell testified that she left three messages with Chief Rifice's secretary that went ignored, when Ms. Hansell called the ACPD to report Mr. D'Alessandro's threat against Larry at Six Shooter's in October 1995, Captain Mooney promptly initiated an IA investigation. At no time were plaintiffs prevented from filing a report against Mr. D'Alessandro.

Nor was Mr. D'Alessandro able to "stave off" his fellow officers from responding to plaintiffs' pleas for help. Plaintiffs contend that Officer DePaul's compliance with Mr. D'Alessandro's instruction outside Six Shooter's "may reasonably be construed by a jury to have enhanced Mr. D'Alessandro's feeling of invulnerability." (Pls.' Br. at 48). The circumstances surrounding the investigation of the Six Shooter's incident do not, however, support this inference. Although Officer DePaul did not further investigate this matter himself, Captain Mooney took seriously Ms. Hansell's complaint, interviewed Officer DePaul, and initiated an IA investigation process. Although the October 1995 complaint was ultimately not

promptly investigated, Sergeant Sutton's failure to investigate was not due to Mr. D'Alessandro's status as a police officer. Sergeant Sutton testified that Ms. Hansell's October 1995 complaint was "lost in the shuffle" because he did not deem the threat made by Mr. D'Alessandro to be of a serious nature. (Defs.' Stat., ¶ 47).

Plaintiffs' reliance on the decision in *Sadrud–Din* is also misplaced. In *Sadrud–Din*, plaintiff's decedent, Selena Johnson, and her estranged husband, Edward Johnson, were both police officers for the City of Chicago. *See Sadrud–Din*, 883 F.Supp. at 272. On May 30, 1988, Edward threatened to kill Selena with his gun. On June 29, 1988, Selena obtained an emergency order of protection, prohibiting Edward from committing physical abuse and entering or remaining in her home. On August 4, 1988, Edward violated the June 29th order of protection by entering Selena's house and physically abusing her. On August 12, 1988, Selena obtained another order of protection and filed a complaint against him with the police department. On August 29, Selena met with Edward's commanding officer to report Edward's abusive behavior over the past several months, and submitted a letter to Edward's commanding officer detailing the incidents of abuse. Selena stated in the letter that "she was in fear for her life." *Id.* at 273. In addition, Selena sent the letter to her own commanding officer, the office of professional standards and internal affairs.

On September 11, 1988, Edward again threatened Selena's life and physically abused her at her home before leaving. On the same day, Selena reported the incident to the police. When the police officers arrived at her residence in response to the complaint, Selena informed them that Edward had threatened her life and violated an order of protection entered against him. The officers immediately requested a supervisor to be sent to the scene. The supervising officer, who knew where Edward was located, arrived at the scene and spoke to Edward by telephone. The supervising officer told Edward that he knew "Edward slapped Selena around" and that Selena wanted him arrested, but failed to arrest Edward or instruct others to do so. *Id.* Two days later, Edward entered Selena's home and shot her eight times, resulting in her death. *Id.*

The *Sadrud–Din* court found that based upon the police officers' repeated failures to act upon Selena's domestic violence reports, despite knowing that Edward, on numerous occasions, threatened her life and had violated orders of protection, that the city had an affirmative duty to protect Selena. *Id.* at 276. The court concluded that "[b]y allowing Edward Johnson to continue to carry his police-issued weapon knowing the information provided by Selena Johnson, the City affirmatively contributed to the circumstances which resulted in Edward Johnson murdering Selena Johnson with that weapon." *Id.*

In *Sadrud–Din*, the police officers, including supervisory personnel, were aware of the danger posed by Edward on Selena's life and Selena's many requests for intervention. Prior to the September 11th incident and within four weeks of her death, Selena obtained a second order of protection against Edward; met with Edward's commanding officer to inform him about Edward's death threats and violation of the June 29th order of protection; filed a complaint against him with the police department; and filed a written report detailing the incidents of abuse and forwarded a copy of the letter to Edward's commanding officer, her commanding officer, the office of professional standard and IA.

In contrast to the facts of *Sadrud–Din*, plaintiffs did not take similar affirmative steps to apprise the ACPD of the potential danger posed by Mr. D'Alessandro. Prior to the Six Shooter's incident, plaintiffs never filed a report advising the ACPD of Mr. D'Alessandro's acts of violence against Ms. Hansell or his children. Moreover, the October 1995 complaint involved a threat made against Larry and not against either Ms. Hansell or the direct victims of Mr. D'Alessandro's violence, Mr. Hansell, Shannon and Christopher. Thus, the inaction of the ACPD officers cannot be deemed to have "placed" the plaintiffs in a dangerous position that was foreseeable.

Significantly, in *Sadrud–Din*, the supervising officer informed Edward that he knew about Edward's unlawful conduct but failed to arrest him. Edward's knowledge of the supervising officer's refusal to arrest him under such circumstances may be construed by the jury to have enhanced Edward's feeling of invulnerability. *See Wright*, 2000 WL 246266 at *5. Further, by informing Edward that Selena had reported his unlawful conduct and had wanted him arrested, the supervising officer may have "placed" Selena in a direct "confrontational encounter" with Edward, thereby increasing the risk of harm to Selena. *See Cornelius*, 880 F.2d at 358.

The Court concludes that the type of "affirmative" conduct necessary to establish the state-created danger theory is not present in this case. The ACPD officers' omissions, including Sergeant Sutton's failure to investigate Mr. D'Alessandro's threat outside Six Shooter's and Chief Sutton's failure to respond to Ms. Hansell's telephone messages, cannot reasonably be construed to have "placed" plaintiffs in greater danger than they had already faced. There is no evidence of any affirmative conduct by the ACPD officers, as in *Wright* and *Sadrud–Din*, which would have enhanced Mr. D'Alessandro's feeling of invulnerability. *See also Freeman v. Ferguson*, 911 F.2d 52, 53–54 (8th Cir. 1990) (state-created danger theory deemed viable, where the plaintiff alleged that police officers were called off from assisting decedent's pleas to enforce a restraining order against her estranged husband on numerous occasions by the police chief).

In this case, the danger to plaintiffs arose because Mr. D'Alessandro, frustrated by his inability to see his children, visited the Hansell residence, while intoxicated, to vent his anger. The ACPD officers' inactions did not create or exacerbate the danger Mr. D'Alessandro presented to plaintiffs. Although Mr. D'Alessandro was armed with a revolver issued by the ACPD, he possessed five other non-ACPD issued weapons. Like the state officials in *Brown*, *D.R.* and *DeShaney*, the ACPD officers' "nonfeasance" in this case does "not rise to the level of a constitutional violation." *D.R.*, 972 F.2d at 1376. Because the Court finds that plaintiffs cannot state a constitutional violation based on the state-created danger theory, there can be no liability under 42 U.S.C. § 1983 against the individual defendants and the City based upon their failure to protect them from Mr. D'Alessandro's violence.[10]

### 2. *Unconstitutional Policy and Custom*

■ Plaintiffs also allege that the City had an unconstitutional practice and custom of ignoring domestic violence complaints made against its officers, which caused a constitutional deprivation. The

---

**10.** The Court's decision in this case should not be construed to hold that state actors cannot be held liable under § 1983 for failing to protect victims of domestic violence under all circumstances.

City argues that plaintiffs cannot establish the existence of such a policy.

■■■ A municipality or its officials may not be held liable under § 1983 for constitutional violations based upon *respondeat superior* for the negligent or otherwise improper actions of its employees. *See Monell v. New York City Dept. of Social Serv.,* 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Section 1983 liability may attach only if plaintiffs can demonstrate that municipal policymakers, acting with deliberate indifference or reckless indifference, established or maintained a policy or well-settled custom which caused a municipal employee to violate plaintiffs' constitutional rights and that such policy or custom was the "moving force" behind the constitutional tort. *See Bd. of the County Comm'rs. of Bryan County, Oklahoma v. Brown,* 520 U.S. 397, 404, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997).

■■■■ A policy is made when "a 'decisionmaker possess[ing] final authority to establish municipal policy with respect to the action' issues an official proclamation, policy, or edict." *Beck v. City of Pittsburgh,* 89 F.3d 966, 971 (3d Cir.1996), *cert. denied,* 519 U.S. 1151, 117 S.Ct. 1086, 137 L.Ed.2d 219 (1997) (citations omitted). "A course of conduct is considered to be a 'custom' when, though not authorized by law, 'such practices of state officials [are] so permanent and well settled' as to virtually constitute law." *Andrews v. City of Philadelphia,* 895 F.2d 1469, 1480 (3d Cir. 1990) (citations omitted). Significantly, municipal acquiescence may not be established by isolated incidents of wrongdoing by non-policymakers. *Cornfield by Lewis v. Consolidated H.S. Dist. No. 230,* 991 F.2d 1316, 1326 (7th Cir.1993). The plaintiff must demonstrate that a policymaker is responsible for the policy or, through acquiescence, for the custom. *See Andrews,* 895 F.2d at 1480.

The Court agrees with the City that plaintiffs have failed to present sufficient evidence to establish the requisite unconstitutional policy or custom in order to prevail on their § 1983 claims. Plaintiffs admit that the ACPD had a written policy governing the investigation of domestic violence complaints made against its police officers. The ACPD IA Order, issued by Chief Rifice, the final decision maker, required that complaints of domestic violence reported by a family member against an ACPD officer be immediately investigated. Other than the single instance of Sergeant Sutton's failure to investigate Ms. Hansell's October 1995 complaint, plaintiffs have failed to present any evidence regarding the existence of a "permanent," "well settled" practice of ignoring reports of domestic violence made against ACPD officers.

Although Ms. Hansell testified that she confided in several ACPD officers regarding Mr. D'Alessandro's acts of violence, she never requested that they file a report on her behalf.[11] With respect to Sergeant Polk, Ms. Hansell specifically requested that Sergeant Polk not report her concerns. Further, there is no evidence that Chief Rifice received the messages Ms. Hansell left with his secretary or was made aware of Detective Reilly's report of the 1990 Shooting Incident to his supervisor, to raise a triable issue of fact as to Chief Rifice's acquiescence to any unconstitutional custom at the ACPD. Accordingly, plaintiffs' § 1983 claims premised upon the existence of an unconstitutional policy or custom of ignoring complaints of domestic violence must fail.

11. Nor have plaintiffs presented any evidence that Chief Rifice was aware of these officers' failure to report allegations of criminal misconduct made against Mr. D'Alessandro.

### 3. Failure of Supervision and Training

██ Plaintiffs· also seek to hold the City and Chief Rifice liable under § 1983 for failing to implement sufficient policies for the supervision and training of its IA officers.[12]

"Where, as here, the policy in question concerns a· failure to train or supervise municipal employees, liability under section 1983 requires a showing that the failure amounts to 'deliberate indifference' to the rights of persons with whom those employees will come into contact." *Carter v. City of Philadelphia,* 181 F.3d 339, 357 (3d Cir.1999) (citing *City of Canton v. Harris,* 489 U.S. 378, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)). The "failure to train may amount to deliberate indifference where the need for more or different training is obvious, and inadequacy very likely to result in violation of constitutional rights." *Id.* "[I]f the police often violate rights, a need for further training might be obvious." *Id.* "Only where a failure to train reflects a 'deliberate' or 'conscious' choice· by a municipality . . . can a city be liable for such a failure under § 1983." *Canton,* 489 U.S. at 389, 109 S.Ct. 1197.

To succeed on this theory of liability, plaintiffs must show both "contemporaneous knowledge" of the allegedly offending incident or "knowledge of a prior pattern of similar incidents and circumstances under which a supervisor's inaction could be found to have communicated a message of approval." *Montgomery v. De Simone,* 159 F.3d 120, 127 (3d Cir.1998). Significantly, the Third Circuit has stated that

deliberate indifference in this context cannot be established by "presenting evidence of the shortcomings of an individual" or by "showing, without more, that better training would have enabled the officer to avoid the injury-causing conduct." *Simmons v. City of Philadelphia,* 947 F.2d 1042, 1060–61 (3d Cir.), *cert. denied,* 503 U.S. 985, 112 S.Ct. 1671, 118 L.Ed.2d 391 (1992).

Plaintiffs' claim rests on the assertion that Chief Rifice failed to promulgate a sufficient policy for training and supervising IA and its officers, as evidenced by Sergeant Sutton's failure to fully and adequately investigate Ms. Hansell's 1995 complaint. Defendants contend that plaintiffs' argument fails because they cannot establish that Sergeant Sutton's departure from established IA polices was part of a continuing pattern of failed investigation, which was known—and deliberately ignored—by Chief Rifice. The Court agrees.

As discussed above, in order to establish deliberate indifference in this context, plaintiffs are required to demonstrate that municipal policymakers were aware of, and consciously disregarded, a pattern of constitutional violations which would have put them on notice of the need for more training and supervision. There is no evidence in the record that IA had a pattern of ignoring domestic violence complaints, and no evidence that Chief Rifice should have had · reason to suspect such a pattern. Further, a policy cannot ordinarily be inferred from a single instance of illegality.

---

**12.** Plaintiffs also contend that Chief Rifice and the City should be· liable for failing to supervise Mr. D'Alessandro or to provide treatment to Mr. D'Alessandro for his alcohol abuse. First, because Mr. D'Alessandro was not a state actor while engaged in the 1996 Shooting Incident, defendants cannot be supervisorily liable for his actions. *See Halwani*

*v. Galli,* No.Civ.A. 99–1450, 2000 WL 968219 at *4 (E.D.Pa. July 13, 2000). Second, there is no evidence that Chief Rifice was aware of Mr. D'Alessandro's alcoholism or acts of domestic violence. Accordingly, plaintiffs' § 1983 claim based upon this theory of liability must also be dismissed.

See Losch v. Borough of Parkesburg, 736 F.2d 903, 911 (3d Cir.1984).

In any event, plaintiffs cannot establish that defendants' failure to supervise and train IA officers resulted in a deprivation of a constitutional right. As discussed above, the due process clause of the Fourteenth Amendment does not secure a right to prompt and effective investigation of domestic violence complaints under the facts of this case. See White v. City of Philadelphia, 118 F.Supp.2d 564, 575 (E.D.Pa.2000) (dismissing plaintiff's substantive due process claim based upon the municipality's failure to implement a policy and to train its officers because the Fourteenth Amendment did not secure a right to rescue services under the facts presented). Accordingly, plaintiffs' § 1983 claims based upon the City's alleged failure to supervise and train it officers must also fail, and summary judgment is granted with respect to counts one, five and six of the First Amended Complaint.

### B. Tort Claims

■ Defendants City and Sergeant Sutton contend that even if they are found liable for general negligence (count two), negligent infliction of emotional distress (count three), intentional infliction of emotional distress (count four) and negligent training and/or failure to supervise (count seven), plaintiffs' tort claims should be dismissed because they cannot establish that their injuries, which stem from the emotional harm they allegedly suffered, are compensable under New Jersey's Tort Claims Act (the "Act"). More specifically, defendants argue, inter alia, that plaintiffs' tort claims are barred because they have not suffered a "permanent loss of bodily function" under the Act. The Court agrees.

■ Under the Act, damages for pain and suffering are only recoverable if the injuries meet a certain threshold. Specifically, N.J.S.A. 59:9–2(d) provides, in pertinent part:

> No damages shall be awarded against a public entity or employee for pain and suffering resulting from an injury; provided, however, that this limitation on recovery of damages for pain and suffering shall not apply in cases of permanent loss of bodily function, permanent disfigurement or dismemberment where the medical treatment expenses are in excess of $1,000.00.

The New Jersey Supreme Court has held that subjective symptoms such as depression, stress, fear and anxiety constitute "pain and suffering" for the purposes of the Act. See Ayers v. Township of Jackson, 106 N.J. 557, 576–77, 525 A.2d 287 (1987)(barring plaintiffs' claim for emotional distress stemming from the contamination of their water supply by toxic pollutants). Moreover, absent objective, medical evidence of a substantial, "permanent loss of bodily function," a plaintiff may not recover damages for "pain and suffering." Brooks v. Odom, 150 N.J. 395, 406, 696 A.2d 619 (1997).

In Srebnik v. New Jersey, 245 N.J.Super. 344, 347, 585 A.2d 950 (App.Div.1991), plaintiff and her husband were involved in a serious one-car accident which left their car in a ditch below the roadway. An eyewitness reported the incident to the police, but the responding state trooper was unable to locate the vehicle. While in the car, plaintiff heard "moan[s] and groan[s]" from her husband. Id. The following morning, plaintiff crawled out of the vehicle and discovered that her husband had died.

In her complaint, plaintiff alleged that as a result of the police officers' failure to promptly respond to the accident report and reasonably search the accident area, her husband's chances of survival was lost and that she suffered permanent and psychological pain. Id. At trial, a psychologist

testified that plaintiff suffered from depression, flashbacks of the accident, anxiety, a "pattern of perpetual withdrawal" and a sense of hopelessness. *Id.* at 348, 585 A.2d 950. The psychologist concluded that plaintiff suffered permanently from chronic post-traumatic stress disorder. *Id.* Despite the permanency of her psychological condition, the *Srebnik* court barred plaintiff's claim for emotional distress because her pain and suffering did not result from a permanent physical infirmity as required by the Act. *Id.* at 351, 585 A.2d 950.

It is undisputed that plaintiffs suffered no permanent physical infirmity as a result of the 1996 Shooting Incident. Instead, plaintiffs contend that they have suffered permanent emotional and psychological injury. Dr. Susan Feister, M.D. diagnosed plaintiffs as suffering post-traumatic stress disorder, major depressive episodes and/or panic disorders stemming from the 1996 Shooting Incident. Plaintiffs rely on the New Jersey Supreme Court's decision in *Collins v. Union County Jail,* 150 N.J. 407, 696 A.2d 625 (1997), in support of their position that they have suffered a compensable injury under the Act.

In *Collins,* the precise issue before the New Jersey Supreme Court was whether the threshold provision of the Act "bars a claim of permanent psychological harm in the form of post-traumatic stress disorder caused by the rape of a prison inmate by a corrections officer." *Collins,* 150 N.J. at 409, 696 A.2d 625. In distinguishing the facts of *Collins* from other cases involving psychological injuries, including *Srebnik,* where there had been no permanent physical injury claimed, the court focused on the aggravating and intrusive nature of the sexual assault. *Id.* at 414, 417, 696 A.2d 625 (noting that whereas "plaintiff was brutally sodomized," the *Ayers* and *Srebnik* plaintiffs did not suffer "any direct, violent, and invasive physical assault").

Significantly, the *Collins* court took special note of the decision in *A.C.R. by L.R. v. Vara,* 264 N.J.Super. 565, 625 A.2d 41 (Law Div.1992), in which "the trial court concluded that the sexual molestation of a child is presumed to result in serious physical and mental injury for which damages are recoverable under the act." *Id.* at 419, 696 A.2d 625. The *Collins* court emphasized that the "missing link" in all of the reported decisions, other than *A.C.R.,* "is an aggravating and intrusive assault that allegedly caused the plaintiff to sustain a permanent psychological injury." *Id.* at 420, 696 A.2d 625. Based upon the presence of "[t]hat combination of aggravating factors" the *Collins* court held "that plaintiff's claim of alleged permanent psychological harm in the form of post-traumatic stress disorder resulting from the rape by the corrections officer, constitutes a 'permanent loss of a bodily function' within the meaning of N.J.S.A. 59:9–2(d)." *Id.* at 420, 696 A.2d 625. In holding that plaintiff's "psychological and emotional injuries should be treated the same as physical injuries under the Act's threshold provision," the *Collins* court specifically limited its ruling to circumstances factually "similar to that which precipitated plaintiff's injuries." *Id.* at 423, 696 A.2d 625.

Although the Court does not doubt that plaintiffs experienced substantial emotional trauma as a result of Mr. D'Alessandro's violent acts, the Court cannot conclude that the circumstances giving rise to plaintiffs' psychological injuries are sufficiently aggravating to meet the *Collins* threshold. The Court reads the narrow holding of *Collins* to apply only to situations in which a plaintiff suffers a direct, violent, and invasive assault, which later manifests itself as a permanent psychological injury. *Collins,* 150 N.J. at 414, 422, 696 A.2d 625 (noting that "it is highly unlikely that the Legislature intended that only the physical

injuries resulting from rape are to be compensated under the Act").

With respect to Ms. Hansell, Larry and Vincent, they were not present at the Hansell household on March 5, 1996 when Mr. D'Alessandro discharged his revolver and held Christopher, Shannon and Mr. Hansell hostage. Like the plaintiff *Srebnik,* these plaintiffs' emotional injuries did not result from any direct assault. Further, although Mr. Hansell, Shannon and Christopher were subject to Mr. D'Alessandro's acts of violence on March 5, 1996, they did not suffer from a similar type of "invasive physical assault" as did the plaintiff in *Collins.*[13] Plaintiffs' alleged pain and suffering are not the direct result of the combination of aggravating factors contemplated in *Collins* to constitute a permanent bodily injury under the Act. Accordingly, counts two, three, four and seven of the First Amended Complaint are barred by the Act.

Lastly, Chief Rifice separately argues that the tort claims against him should be dismissed because plaintiffs failed to file the requisite notice of their claims under the Act pursuant to N.J.S.A. 59:8–8. It is undisputed that plaintiffs failed to name Chief Rifice in their notices under the Act, and plaintiffs do not address this argument in their opposition brief. Accordingly,

summary judgement is granted dismissing counts two, three, four, and seven of the First Amended Complaint against Chief Rifice for failure to comply with N.J.S.A. 59:8–8.

## V. *Conclusion*

For the foregoing reasons,

· **IT IS** on this 6th day of June, 2001,

**ORDERED** that defendants' motions for summary judgment are granted.

---

13. In the alternative, the Court further finds that Mr. Hansell, Christopher and Shannon have failed to present objective, medical evidence that the psychological injuries to them are permanent and substantial. With respect to Christopher, plaintiffs have failed to present any expert testimony regarding any injury suffered or treatment received by Christopher as a result of the 1996 Shooting Incident. With respect to Mr. Hansell and Shannon, there is no indication that Dr. Feister verified plaintiffs' complaints by examination and observation. *See Randall v. State,* 277 N.J.Super. 192, 198, 649 A.2d 408 (App.Div. 1994)("an expert's opinion is not admissible if it merely parrots what is said by the patient"). Further, Dr. Feister does not opine that Shan-

non's and Mr. Hansell's psychological injuries are permanent. *See Denis v. City of Newark,* 307 N.J.Super. 304, 318, 704 A.2d 1003 (App. Div.1998) (court properly dismissed plaintiff's action against defendants for failure to present objective evidence of the permanency of the injury under the Act). Nor have plaintiffs presented objective, medical evidence that Mr. Hansell's and Shannon's psychological injuries are substantial. *See Hammer v. Township of Livingston,* 318 N.J.Super. 298, 301, 723 A.2d 988 (App.Div.1999)(barring plaintiff's claim under the Act because plaintiff is not prevented by her psychological disorder "from carrying out her ordinary day-to-day functions or that she cannot live a normal life").